# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:23-CR-152(1)** |
| Plaintiff, | **CHIEF JUDGE SARAH D. MORRISON** |
| vs. | |
| **FAISAL M. DAROD,** | |
| Defendant. | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this Sentencing Memorandum in connection with Defendant Faisal M. Darod's upcoming sentencing hearing. The parties have raised two objections to the PSR which, if sustained, would yield an initial, combined sentencing range of 375–408 months of imprisonment, 240 months of which is mandatory time. The Government respectfully requests that the Court sentence Darod to a term of imprisonment of 360 months (30 years), to be followed by a three-year term of supervised release.

### I. BACKGROUND

In the Spring of 2023, Darod began aiding his friend, Abdisamad Ismail, in his acquisition of a firearm, an extended magazine, and several boxes of ammunition that the pair – together with a third accomplice, Aden Jama – would later use in an extended crime spree. That crime spree involved the armed robberies of five high-end automobile dealerships, banks, and gaming stores in and around Columbus, Ohio, and it ended in a deadly shootout with Columbus Police Officers on I-70.

Darod became friends with Ismail and Jama while visiting Somalia in 2020. They grew closer to one another after returning to Columbus. In the Spring of 2023, Darod began making concerted efforts to obtain a firearm for Ismail. Eventually, Ismail obtained a Glock 9mm handgun, and Darod purchased several boxes of ammunition and an extended 33-round magazine. By June of 2023, Ismail and Darod began using that Glock handgun, ammunition, and extended magazine to commit a host of armed robberies, summarized below.

*GameStop Robbery (Hilliard):* On June 21st, Darod aided Ismail in the armed robbery of a GameStop in Hilliard after learning that a bank they'd hoped to rob had already closed for the day. Darod waited as a lookout in their getaway car while Ismail went inside, brandished the Glock handgun at the store customers and employees, and demanded several gaming consoles. Ismail forced two employees at gunpoint to a back storeroom to retrieve the merchandise. He then ordered everyone to get behind the counter, look away, and wait several minutes before moving. Ismail left the store, reunited with Darod, and fled the scene together. Darod then began texting his associates to see how he could sell their stolen merchandise.

*Corvette Stingray Robbery (Westerville):* On July 23rd, Darod aided Ismail in the armed robbery of a Corvette Stingray from the Westerville Auto Group in Westerville. Darod drove Ismail to the dealership and dropped him off. Ismail then spotted one of the owners in the parking lot, brandished the Glock handgun at him, and claimed he was "back for the Maserati" Gran Turismo he had previously stolen but abandoned – mistakenly believing it was back on the lot.

The owner told Ismail they no longer had the Maserati, so Ismail forced the owner from the parking lot inside of the dealership at gunpoint, where he then pointed the gun at the owner and his father. The owner gave Ismail the keys to a Corvette Stingray instead. Ismail ordered both owners to sit on the ground until he left in the Corvette, which was valued at over $41,000. He also threatened to shoot them if they did not comply. Ismail then got in the Corvette and drove off the lot. He reunited with Darod soon after the robbery. Over the next two days, Darod filmed several videos of himself driving the stolen Corvette in and around the Baymont Inn and Suites off I-71, which he and Ismail were using as a "safe house."

*Fifth Third Bank Robbery (Upper Arlington):* On July 5th, Darod aided Ismail in the armed robbery of a Fifth Third Bank branch in Upper Arlington. Prior to the robbery, Darod helped Ismail search for Fifth Third locations and arranged for their friend and co-defendant, Aden Jama, to pick them up after the robbery. Here again, Darod drove Ismail to the bank in the Corvette Stingray they had recently stolen. Ismail went inside, brandished the Glock handgun at the bank tellers, and demanded that they emptied their drawers. Ismail then demanded more money, so he forced the tellers – at gunpoint – to take him to the vault to get more cash. After obtaining $75,436 in cash, Ismail ordered the customers and employees to remain behind the counter for five minutes before doing anything. Ismail threatened to shoot and kill the victims if they did not comply. Darod and Ismail then dropped the stolen Corvette off in a nearby neighborhood. Jama met them at that drop location and drove them back to the Baymont Inn.

*Porsche Cayenne Robbery (Whitehall):* The next day, the trio struck again. Ismail, Darod, and Jama first met up at the Baymont Inn before driving together to the Byers Imports car dealership in Whitehall. Darod and Jama dropped Ismail off at the dealership. Ismail proceeded to brandish the Glock handgun at the customers and employees while threatening to shoot someone if he did not get the keys to a Porsche. Eventually, Ismail trained his focus on a male sales associate. Ismail pointed the gun at the man's head while repeatedly asking, "Are you ready to die?" The sales associate found the keys to a Porsche Cayenne valued at over $90,000 and gave them to Ismail. Ismail took the keys, stole the Porsche, and then sped off the lot prior to rejoining Darod and Jama at a pre-determined meetup location.

*Fifth Third Bank Robbery (Columbus):* After reuniting, the trio sped to the west side of Columbus, where they located a Fifth Third Bank branch to rob. Ismail went inside while Darod and Jama waited in the stolen Porsche. Ismail brandished the handgun at the customers and employees of the bank; forced the manager to open the vault at gunpoint; and then herded the manager, the other tellers, and the customers into the manager's office, where he ordered them to stay and to not call the police. Ismail made off with $85,236 in cash. By the time Ismail ran back outside, Whitehall Police Officers had surrounded the stolen Porsche and had ordered everyone out of the vehicle. Rather than comply, Ismail jumped into the driver's seat, and the trio sped away through the cordon of police vehicles, over a grassy embankment, and onto Hilliard-Rome Road.

*High-Speed Chase and Shootout*: A multi-agency police pursuit followed. Columbus Police Officers followed the stolen Porsche onto I-70 East, headed toward downtown in rush-hour traffic. Given that traffic, Ismail crashed the Porsche into a guardrail. Darod and Jama hopped out and fled down the freeway on foot. Ismail, however, crouched down behind the Porsche – lying in wait for the responding officers. The first officer on-scene ("Officer A") jumped out of his patrol vehicle and began chasing Darod and Jama while yelling at them to stop. Officer A was unaware that Ismail was waiting to ambush him. When Officer A approached the Porsche, Ismail opened fire. Ismail shot Officer A five times, including one shot that severed his femur, knocked him to the ground, and led to profuse bleeding; one shot to the hand that made return fire more difficult; one shot to the buttock; and two shots that struck his bulletproof vest. Despite those near-fatal gunshot wounds, Officer A was able to clear a weapon malfunction and return fire. Officer A and other responding officers shot and killed Ismail. Officers then placed a torniquet on Officer A's thigh before rushing him to Grant Medical Center. He nearly bled to death on the way to the hospital, where he remained for the next several months while enduring several excruciating rounds of emergency surgeries.

*Attempted Escape to Somalia*: Following the shootout, a manhunt ensued for Darod and Jama. They first ran to a nearby women's shelter, which turned them away. They then obtained transport back to the Baymont Inn. Prior to his arrest, Darod repeatedly searched online for flights to Somalia – a non-extradition country. Jama was arrested while trying to board a flight from Chicago to Turkey/Somalia.

5

*Darod's Arrest and Interview:* Columbus Police Officers found Darod within twelve hours of the shootout and brought him to headquarters for questioning. He waived his *Miranda* rights and agreed to answer questions. During that interview, Darod repeatedly lied to detectives regarding his relationship with Ismail and his role in the robberies and shootout. In short, Darod claimed that he didn't know Ismail that well; that he wasn't with Ismail prior to the Porsche robbery; and that Ismail held Darod and Jama hostage at gunpoint while he drove to the Fifth Third Bank and robbed it. Given Darod's false statements to the detectives, they released him from custody, which led to delays in the investigation and yet another search for him after the filing of a federal criminal complaint.

*Darod's Guilty Pleas:* On October 11, 2023, Darod pled guilty to Counts 1–5 and 7–10 of the Superseding Indictment under a binding plea agreement. In that agreement, the parties agreed to a total range of between 240 months (20 years) and 360 months (30 years) of imprisonment, to be followed by a three-year term of supervised release.

## II. The Applicable Guidelines Range

The PSR calculated a Total Offense Level of 35 and a criminal history category of I, resulting in a guidelines range of 168–210 months of imprisonment with respect to Counts 1, 2, 4, 7, and 9 (robbery counts), and a range of 60 months each with respect to Counts 3, 5, 8, and 10 (firearm counts), which must run consecutively to one another and to any sentence imposed for the robbery counts. The parties have raised two joint objections to those calculations.

6

*2-Level Role Reduction (All Counts):*  The parties first object to the 2-level adjustment under U.S.S.G. § 3B1.2(b) for being a "minor participant" and counter that Darod should receive the larger 4-level adjustment for being a "minimal participant" under § 3B1.2(a).  Under the guideline commentary, Darod qualifies for the larger 4-level reduction.  *See* U.S.S.G. § 3B1.2 app. nn.3(C) and 4.  For starters, he lacked significant decision-making authority over the robberies.  Likewise, the nature and extent of his participation in those robberies (driver and lookout) was substantially less than Ismail's.  Finally, there is no evidence to suggest that Darod stood to share in a large portion of the profits from the robberies.  If the Court were to sustain this objection, Darod's Total Offense Level would decrease from 35 to 33.

*2-Level Enhancement for Physical Restraint of a Victim (Count 7):*  The parties next object to a 2-level enhancement under U.S.S.G. § 2B3.1(b)(4)(B) for the physical restraint of a victim in connection with Count 7.  The Government submits that Ismail's conduct while inside of Byers Imports – although heinous – falls just short of "physical restraint" under *United States v. Ziesel*, 38 F. 4th 512, 515 (6th Cir. 2022), which held that ordering a bank teller to kneel on the floor – without more – was not sufficient to trigger this enhancement.  The Court's ruling on this objection will *not* impact the guideline calculations given the multiple-count adjustment.

### III.  Possible Departures from the Applicable Guidelines Range

The Probation Officer noted that an upward departure may be warranted under U.S.S.G. § 5K2.3, which applies if a victim suffered psychological injury much more serious than that normally resulting from commission of the offense.

7

Under this provision, a departure is warranted "when there is substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns." U.S.S.G. § 5K2.3.

The Probation Officer provided a detailed and heart-wrenching account of the psychological impacts that the shooting has had and will continue to have on Officer A, likely for the rest of his life. Suffice to say, Officer A continues to suffer from deep-seated, first-level trauma and pain from the shooting itself; second-order trauma from the relentless cycle of surgeries, infections, and hospitalizations that have followed; and third-order trauma from the seeming loss of his identity as a police officer and confusion over what lies ahead for him and his family.

Those impacts are far more severe, and far more long-lasting, than other robbery cases in which the Sixth Circuit has affirmed application of this departure. *See, e.g.*, *United States v. Lucas*, 889 F.2d 697, 699, 700–01 (6th Cir. 1989) (female bank teller who was forced to strip naked at gunpoint felt "very dirty," "guilty," and "gross"; changed jobs; and was still undergoing counseling); *United States v. Morgan*, No. 96-5442, 1998 WL 45490, at *2 (6th Cir. Jan. 27, 1998) (female robbery victim had "become much less independent," "need[ed] constant attention and support in the handling and transfer of her person and money between restaurant and home," and "had continued episodes of fear upon recollecting the robbery").

For these reasons, a 4-level upward departure is warranted.

## IV.  Consideration of the Sentencing Factors from 18 U.S.C. § 3553(a)

*Nature and Circumstances of the Offenses:*  The nature and circumstances of Darod's offenses elude description, and the costs of his actions extend far beyond the fruits of the robberies themselves.  The victims of those robberies remain traumatized from being held at gunpoint and having their lives threatened.  Several victims quit their jobs.  Others asked for reassignment to positions that do not interact with the public.  Still others took leaves of absence.  Likewise, many of those victims sought mental health treatment for their PTSD and anxiety.  Worse still, one man is dead because of Darod's actions, and another was gravely injured.  Officer A barely survived his gunshot wounds.  The impact the shooting had on him, his wife, and their three young children continues to reverberate to this day and may well haunt them for all time.  And while Officer A emerged from this tragedy as a hero, he did so at untold personal, physical, and mental cost.  Darod must be punished accordingly.

*History and Characteristics of the Defendant:*  Aside from the rush of living out a video game ("Grand Theft Auto"), Darod's history and characteristics fail to explain why he would aid and abet multiple armed robberies.  He was born in America and lived here for most of his life.  He was raised in a close-knit family with supportive parents who stressed the importance of education and religion.  He excelled in high school, where he took several early college courses.  He even studied at Columbus State for two semesters.  He did, however, abuse alcohol, marijuana, and Percocet.  Prior to his arrest, Darod held several jobs, including as a bank teller and delivery driver.  Considering this background, his conduct in this case seems inexplicable.

9

*Remaining Sentencing Factors:* None of the remaining sentencing factors takes this case or this defendant outside the "heartland" of robbery cases. As such, there is no reason to sentence Darod a term of imprisonment of even one day less than thirty years, which is already well below the low end of the advisory guidelines range. A thirty-year sentence will encourage respect for the law, deter Darod and others from further criminal conduct, and protect the public from similar violence and depravity. *See* 18 U.S.C. § 3553(a)(2). A thirty-year sentence will also help avoid unwarranted sentencing disparities. *See id.* § 3553(a)(6); *United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008).

## V. CONCLUSION

The United States respectfully requests that the Court impose a term of imprisonment of 360 months (30 years), to be followed by a three-year term of supervised release, in addition to imposition of a $900 special assessment, and a total restitution award of $157,102.42, made payable to the victims as outlined in the PSR.

    Respectfully submitted,

    KENNETH L. PARKER
    United States Attorney

    s/Noah R. Litton
    NOAH R. LITTON (0090479)
    Assistant United States Attorney
    303 Marconi Boulevard, Suite 200
    Columbus, Ohio 43215
    Office: (614) 469-5715
    E-mail: Noah.Litton@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Sentencing was served electronically this 11th day of December 2024 upon Robert Krapenc, counsel of record for Defendant Faisal Darod.

s/Noah R. Litton
NOAH R. LITTON (0090479)
Assistant United States Attorney
